STATE, *ex rel.* COMO D. MASSEY, v. J. M. LEE, as Comptroller of the State of Florida.

167 So. 530.

En Banc.

Opinion Filed April 16, 1936.

*R. P. Hamlin, John S. Lavin, H. M. Hampton* and *Waller & Pepper*, for Relator;

*Cary D. Landis,* Attorney General, and *Ira A. Hutchison* and *John L. Graham,* Assistants, for Respondent.

ELLIS, P. J.—During the session of the Legislature of 1935 an Act to provide for the "Cancellation of Certain State and County Liens for Taxes Held by the State" against certain lands "Acquired or Contracted for Purchase Thereof by the United States or any Duly Constituted Agency Thereof for Reforestation or Game Preserve Purposes, or Military Aviation Purposes" was passed. It was approved by the Governor on June 4, 1935, and immediately became effective. See Chapter 17424, Laws of Florida, 1935.

Section 1 of the Act provided that in all cases where lands in this State were owned or "hereafter acquired, or contracted for the purchase thereof, by the United States of America," or any agency thereof, for "reforestation or game preserve purposes, or Military Aviation purposes, against which there shall be any outstanding tax lien or liens for state and county taxes, evidenced by tax sale certificates, or otherwise, held by the State of Florida, representing state and county taxes for the year 1935 or any year or years prior thereto, such tax lien or liens or part thereof shall be cancelled by the State Comptroller," in the manner provided in the Act.

Section 2 of the Act provides the manner or method of procedure to obtain the cancellation of such tax certificate

or liens. The method prescribed is that information shall be first given to the Board of County Commissioners that the United States has acquired or contracted to purchase lands for the purposes described. Upon such fact being made to appear to the Board, it is required by resolution to request the State Comptroller to cancel the tax liens. The resolution so adopted becomes the Comptroller's authority to cancel the tax liens which may exist against the lands acquired or contracted for by the United States.

On March 12, 1934, a year and several months before the enactment of the statute, Como D. Massey was the owner of certain lands located in Marion County, Florida, against which there were certain outstanding tax certificates held by the State. On that date Massey entered into a contract with the United States for the sale of the lands for reforestation purposes and as an addition to the "Ocala National Forest." The United States agreed to pay for the land when the "taxes upon the same should be satisfied and the title thereto should be approved and determined to be vested in the United States of America free and clear of all liens, claims and encumbrances."

In April, 1935, Massey and wife by deed conveyed the lands to the United States of America; the title to the lands having been approved. The amount which the United States agreed to pay for the land was $2516.52. The amount of taxes outstanding against the property as evidenced by the tax certificate is $2260.00. That situation was duly made known to the Board of County Commissioners for Marion County in July, 1935, at a regular meeting of the Board, which adopted a resolution, as the statute required, requesting the Comptroller of the State to cancel the tax liens which were set forth and described in the resolution.

A certified copy of the resolution was delivered to the Comptroller.

Upon his refusal to cancel the tax liens upon the lands Massey applied to this court and obtained an alternative writ of mandamus to carry out the provisions of the law by the entry of an appropriate order cancelling the taxes upon the lands.

The Comptroller interposed a motion to quash the alternative writ. Seven grounds why the writ in the opinion of the Comptroller should be quashed are set out in the motion. One ground is that no duty is shown to rest upon the Comptroller to cancel the tax liens. The second is that the contract for the sale of the land was made prior to the passage of the Act and that the purchase of the land by the United States rested upon the consideration that the relator Massey should pay the taxes upon them. The third and fourth grounds set forth that the benefits sought under the provisions of the Act in this case would accrue to the relator and not to the United States and that the tax certificates are the obligations of the relator and not of the United States Department of Agriculture. The fifth ground is that the Act violates Section 1 of Article IX of the Constitution, which provides for a uniform and equal rate of taxation. The sixth ground attacks the validity of the Act as contravening Section 12 of Article IX of the Constitution. That section of the Constitution has no relation to the subject. The reference is probably to Section 9 of Article XII which relates to the composition of the County School Fund. The seventh ground is in substance a reiteration of the second, third and fourth grounds of the motion.

In the brief submitted by the Attorney General's office in

behalf of the Comptroller, two questions are presented as follows:

"1. Does Chapter 17424, Acts of 1935, Laws of Florida, Apply to Past Transactions Where the Payment of Delinquent Taxes and Tax Liens are the Obligations of the Vendor and Not of the United States Government, and Where a Cancellation Thereof Would Not Inure to the Benefit of the United States but to the Benefit of the Vendor?

"2. Is Chapter 17424, Acts of 1935, Laws of Florida, Invalid and Unconstitutional Insofar as it Attempts to Exempt Lands of Individuals From Taxation by the Indirect Method of Cancelling Outstanding Tax Liens Thereon?"

Two facts which the Attorney General deems to be determinative of the question presented are undisputed. First, the contract for the sale of the lands by Massey to the United States was executed and the deed of conveyance delivered prior to the enactment of the statute. Second, that part of the consideration for the purchase moving to the United States was that the "land is clear, free and unencumbered" and because of the taxes or tax liens outstanding against the land the United States will not pay to Massey the price agreed on "until the matter of taxes and tax liens upon the said lands has been adjusted."

It is apparent that the statute became no part of the contract for the sale of land entered into between Massey and the United States because both the contract and deed of conveyance were executed before the passage of the Act.

It is also apparent that the United States considered the matter of outstanding taxes and required the vendor to cause such liens to be removed before it would pay the agreed price of two dollars and seventy-five cents per acre.

The contract contains a provision that if the vendors should not within a year "show in themselves a safe title, satisfactory to the Attorney General of the United States" to the lands "or do not, when called upon by the proper officer or agent of the United States, promptly convey said title or titles to the United States" as provided for, then the title to the land should be acquired by the institution of condemnation proceedings, in which case the evidence to be presented by appraisers or assessors in condemnation proceedings in estimation of value of said lands shall be on the basis of an average value of two dollars seventy-five cents ($2.75) per acre, being the same price as stipulated in the case of purchase."

The contract therefore contemplated that the United States should acquire the land from the vendors free of the tax liens sought in this proceeding by Massey to be cancelled.

Such was the agreement when the legislative Act was passed. That Act was designed for the benefit of the projects inaugurated by the United States for reforestation, game preserve purposes or military aviation purposes. If it had purchased the land outright, ignoring the existence of liens for taxes and acquired the title subject to such liens, a different proposition would be submitted. It could have upon its application, or in proceedings inaugurated by it, obtained the benefits which the Act designed should accrue to the Government, but such a case is not presented.

Mr. Massey, the vendor, seeks personally the benefits of the Act, which if he obtained would increase the purchase price of the land by exactly the amount due by him for taxes, which is $2,260. So that instead of realizing $2,516.52, less $2,260.00 tax obligations to the State and County, leaving him a net price of $256.52 for his land, he

obtains that amount increased by his tax obligation of $2,260.00.

In the event of condemnation proceedings the petition would be required to set forth the names and interests of all owners, judgment creditors, and lien holders. See Sec. 2263 C. G. L. 1927. So that in estimating the value of the land by the terms of the agreement the matter of liens for taxes would have to be considered.

It is the view of the court that the Act was not designed for the benefit of individual owners of land as distinguished from the United States as the holder of the legal or equitable title of the land for the projects inaugurated by it.

The Act has no application to a case like the one presented. The petition shows no duty owing by the Comptroller under its provisions to the petitioner, so the writ should be quashed.

Motion to quash granted.

WHITFIELD, C. J., and TERRELL, BROWN, BUFORD and DAVIS, J. J., concur.